## BONNIOT & Co. *v.* FUENTES & Co.

The well settled rule that courts will not lend their aid to establish a demand founded upon a violation of law, will not be extended to close the door of justice against an honest principal, on account of a fraud committed by his agent.

A factor can not pledge the goods of his principal for his own debts, and where the pledge is cognizant of the ownership, he can not, in an action by the owner, avail himself of the defence that he has been misled by any act or omission of such owner.

APPEAL from the Fifth District Court of New Orleans, *Augustin,* J. *Magne* and *Rosilius,* for plaintiff and appellant. *Hunton & Bradford,* and *Eyma,* for defendant.

SPOFFORD, J. *A. Bonniot & Co.,* residents of France, and merchants of Jarnac in the arrondissement of Cognac, shipped ninety-seven packages of brandy, on consignment, to *Noël & Guiraud,* of New Orleans.

The shipment was made at Bordeaux, on the 28th February, 1851.

The ship John Holland laden with these brandies, entered the port of New Orleans on the 19th May, 1851.

The brandies went into the custom-house warerooms under the general order, and so remained without an entry of any kind until the 29th December, 1851.

It seems that *Noël & Guiraud,* who did a commission business, were indebted to the firm of *J. J. Prom & Co.,* of Bordeaux, in a sum amounting nearly to $6,000, probably for similar consignments.

*Prom & Co.* employed *Fernando de Fuentes & Co.,* of New Orleans, as their agents; on the 25th December, 1851, *Fuentes & Co.* anxious to secure the debt due to their principals, approached *Noël & Guiraud* upon the subject of a compromise to avoid an impending suit, and proposed to extend the time of payment, provided they would furnish collateral security. The result was a verbal agreement that the ninety-seven casks of brandy consigned by *Bonniot & Co.* to *Noël & Guiraud,* then under the keys of the custom-house, should be given in pledge to *Fuentes & Co.,* as agents of *Prom & Co.,* to secure the debt.

On the next day, pursuant to their own agreement, *Noël & Guiraud* addressed a letter to *Fuentes & Co.,* in which after stating the contract, they say:

"Comme garantie du paiement des dits billets, nous vous avons remis ce matin facture et connaissement endossé à votre ordre, à quatre-vingt dix-sept futailles cognac, sous les clefs de la douane au *general order*, dont vous ferez l'entrée vous-même au *warehouse.*"

·This is the pledge on which the defendants rely to defeat the claim of the owners who sue to recover the brandies thus misapplied by their factors.

It will be observed that the contract was made between the factors and the defendants on the 25th of December, and the letter alluding to the invoice and bill of lading as having been sent the same morning, was written on the 26th of December, 1851, up to which time no entry whatever had been made in the custom-house.

*Fuentes & Co.* did not rest satisfied with the invoice sent on the 26th, and which seems to have been a duplicate, the true invoice made out by the plaintiffs in France and forwarded to *Noël & Guiraud*, in which the goods were estimated at the sum of 16,348 francs. But a partner of their house afterwards went to the office of *Noël & Guiraud* and asked for an invoice, in order to make an entry in the custom-house; *Noël & Guiraud* seemed readily to understand what this meant; *Guiraud* furnished notes or memorandums to one of his clerks, who proceeded to manufacture the invoice; with the facility of an expert in the business, he soon produced the required document, in which the same brandies figure, the only change being in the prices, which, according to the new estimate, amount in the total to 13,885 francs; this clerk was sworn as a witness in the cause and testified that this invoice was prepared by him "simply to make an entry in the custom-house."

Armed with this new document, *De Fuentes* proceeded on the 29th of December, to make a warehouse entry of the brandies. He took the agent's oath prescribed by the Act of Congress of March 1st, 1823, and sought to make the entry thereupon; but the Deputy Collector perceiving that there was no Consulate certificate attached to the invoice, refused to allow the entry, stating to *Fuentes* that the law required the owner's oath on all warehouse entries, to which he replied that the owners were in the city; after which, *Fuentes* returned with *Guiraud*, who filled up the oath on the back of the entry in his own handwriting and was sworn. At the same time a bill of lading was produced endorsed in blank by *Noël & Guiraud* when the entry was completed. *Fuentes & Co.* giving the usual bond for a warehouse entry.

*Noël & Guiraud* were at that time on the eve of bankruptcy and shortly afterwards failed. The plaintiffs employed an agent to take their business out of their hands, who did not discover the fraud perpetrated in regard to these brandies, until the spring of 1852, when, having put *Fuentes & Co.* in default, he brought this suit to recover the goods.

The defendants invoke the rule that courts cannot lend their aid to establish a demand founded upon a violation of law. No rule is better settled or more salutary in its operation. So long as good men sit in the judgment-seat, suitors who come before them with lying lips or impure hands will be turned empty away.

But the action of these plaintiffs does not spring *ex turpi causâ.* It is an action to recover property which was lawfully theirs, and which the defendants acquired, not by reason of any fraud or immorality practised by the plaintiffs, but by the wrong doing of their factors and consignees. The particular tort which first enabled the defendants to get the control of the property was

BONNIOT
v.
FUENTES.

the bad faith of the factors towards their principal in assuming to pledge for their own debts that which they received in trust for him.   The fact that after they had taken the first wrong step they took another, and by false swearing, defrauded the revenue of the United States, adds to their own turpitude but does not detract from the plaintiffs' rights.

So far as appears from the record, all the invoices forwarded by the plaintiffs were just and correct.   It is not shown that they meditated, still less that they consummated any fraud.   To hold them answerable for the fraud of their consignees committed after they had broken their faith towards their principals by converting their goods to an improper use in violation of law, would be to reverse the presumption of innocence until guilt is proved, and to carry to a dangerous extreme the doctrine of liability of the principal for the conduct of his agent.

The only thing amounting to negligence, even that can be imputed to the plaintiffs, is their failure to forward an affidavit of the cost of the goods if they were the purchasers, or the market value if they were the manufacturers, attested by a Consular certificate, as called for by the Act of March 1st, 1823, already alluded to.   But this neglect does not constitute a fraud, or even a badge of fraud in the present case.   The statute does not make it so.   The statute even contemplates that such an occurrence may happen, and provides for the contingency.   When the goods of foreigners shall not be accompanied with the invoice verified by the owner's or manufacturer's oath, authenticated by the Consular certificate, or where it shall not be practicable to make such oath, or where there shall be an informality in the oath or certificate, &c., the Secretary of the Treasury is authorized to admit the goods to entry upon an appraisement, provided the consignee, importer, or agent gives bond to produce the invoice, &c., within eight months, if imported from places this side the Cape of Good Hope.   See sect. 2 and 10, Act 1st March, 1823, U. S. Stat. at large, vol. 3, p. 730.

It is an error to suppose that the plaintiffs could have prevented the fraud by sending their oath with the Consular certificate.   That document would have been sent to the consignee with the bills of lading and invoices.   If it had been sent to *Noël & Guiraud*, they could have suppressed it as easily as they did the true invoices which were sent, and it cannot be supposed under the evidence in this record that they would have scrupled to do so.

But it is urged that if the plaintiffs may be heard in consequence of their want of participation in the fraud upon the law, still their demand must be rejected, and they must abide the loss, because they so clothed their consignees with the *indicice* of ownership in the goods as to enable them to mislead the defendents.

That as a general rule, a factor cannot pledge the goods of his principal for his own debts, is so well settled that it would be a waste of time to discuss the matter.   *Hadwin* v. *Fisk*, 1 Ann., 74.   *New Orleans Draining Company* v. *De Lizardi*, 2 Ann., 287.   C. C. 3109–12–13–16.   Story's Bailment, §§ 325–6.   Story's Agency, §§ 78, 113, 224, 225.   2 Kents' Com., pp. 625–6, (2d Ed).

What have the plaintiff's in this case done or omitted to do, that they should be deprived of the benefit of this rule ?

They have sent bills of lading to their consignees.   But that they were compelled to do to make the consignment.   They have, it seems, omitted to send an affidavit of cost or value with the invoice, attested by the certificate of a

consul or commercial agent. But if such a document had been sent, *non con-* <span>BONNIOT<br>*v.*<br>FUENTES.</span>
*stat* that it would have prevented the consignees from abusing their trust.

The law requiring the owner's oath to effect an entry in the custom-house, is not in the nature of a registry law to notify the public of titles to property deposited in the government warehouses, but is intended purely to guard the revenues against the fraudulent machinations of importers.

There is sufficient evidence, we think, to show that the defendants were cognizant of the fact that the goods they took in pledge, did not belong to *Noël & Guiraud*, and they cannot therefore avail themselves of the defence that they have been mislead by any act or omission of the plaintiffs. The conclusions announced in this opinion have been reached without the aid of the rejected evidence. It becomes unnecessary then to pass upon the questions raised by the bills of exceptions.

It is therefore ordered, adjudged and decreed, that the judgment of the District Court be avoided and reversed; and it is further adjudged and decreed, that the plaintiffs recover of the defendants the ninety-seven packages of brandy described in the invoice annexed to their petition or the proceeds thereof, after deducting all lawful charges against the same: it is further ordered, that the defendants pay costs in both courts.